**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD JAMES BARBER, | : | |
| Plaintiff, | : | Civil Action No. 10-1888 (SRC) |
| | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHRIS CHRISTIE, et al., | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

> RONALD JAMES BARBER, JR., Plaintiff pro se
> #000104 South House
> Special Treatment Unit
> CN-905
> Avenel, New Jersey 07001

**CHESLER**, District Judge

Plaintiff, Ronald James Barber, an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24, et seq., seeks to bring this action in forma pauperis. Based on his affidavit of indigence, the Court will grant plaintiff's application to proceed in forma pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a)(1998) and order the Clerk of the Court to file the Complaint.

At this time, the Court must review the Complaint,[1] pursuant to 28 U.S.C. § 1915(e)(2), to determine whether it should be

_____

[1] Plaintiff filed an addendum to his Complaint on or about April 29, 2010.  See Docket entry no. 2.  He filed a second addendum on or about June 9, 2010.  See Docket entry no. 4.

dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that the Complaint should be dismissed without prejudice at this time.

## I.   BACKGROUND

Plaintiff, Ronald James Barber ("Barber"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Chris Christie, the Governor of New Jersey; Paula Dow, Attorney General for the State of New Jersey; Gary Lanigan, Commissioner of the New Jersey Department of Corrections ("NJDOC"); Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("NJDHS"); Steven Johnson, NJDOC Administrator; and Merril Main, NJDHS Administrator. (Complaint, Caption and ¶¶ 4b-4g). The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

Barber alleges that, on March 17, 2010, a community meeting was held at the Northern Regional Unit ("NRU") in Kearny, New Jersey to discuss a proposed transfer of the NRU residents to the East Jersey State Prison ("EJSP") in Rahway, New Jersey.[2]  The

---

[2]  The transfer of the NRU residents at the Kearny facility has been the subject of newspaper articles and a recent application for injunctive relief in a pending civil case in this

meeting was conducted by defendant Steven Johnson.  Johnson told
the residents that they would be housed in the administrative
segregation unit at the EJSP.  He also told the residents that
they would have to take their mattresses with them.  (Compl., ¶ 6
Statement of Claims).

On March 25, 2010, a memorandum was issued informing the
residents that they can not order personal belongings, such as
food and clothing, or pay bills because of the pending transfer
to EJSP.  There also was a deadline of April 9, 2010, for

_____

District Court, Alves, et al. v. Ferguson, et al., Civil Action
No. 01-cv-0789 (DMC)(MF)(Consolidated).  This Court refers to the
Opinion issued by the Honorable Dennis M. Cavanaugh, U.S.D.J., in
the Alves case, on March 29, 2010, in which Judge Cavanaugh
denied injunctive relief.  (See Docket entry no. 115).  In Alves,
the residents moved to have the Court order that (a) the resident
population at the Annex (another NJDOC facility in New Jersey)
not be increased without leave of Court; and (b) the State of New
Jersey must provide residents' counsel with at least 30 days
notice of any proposed transfer to allow the residents an
opportunity to seek Court intervention, if necessary.
Specifically, for purposes of factual background in this action,
Judge Cavanaugh noted that, "[p]ursuant to County of Hudson v.
State of New Jersey, the State of New Jersey is required to turn
over the premises of the [Kearny] facility to the County of
Hudson by May 19, 2010.  See 2009 N.J. Super Unpub. LEXIS 1188,
at *19 (N.J. Super. A.D.).  Accordingly, the State must locate
another temporary or permanent facility to house the SVPs
currently living there."  (March 29, 2010 Opinion, Docket entry
No. 115, at pg. 2).  Judge Cavanaugh further noted that a
February 3, 2010 newspaper article had reported that the
residents of the Kearny facility were to be relocated to the
Special Treatment Unit "Annex" in Avenel, New Jersey, located on
or near the grounds of the East Jersey State Prison.  However, by
the time the briefing on the residents' motion was completed, it
had been confirmed that another location had been selected,
namely, the administrative segregation unit in East Jersey State
Prison itself.  (March 29, 2010 Opinion, Docket entry No. 115, at
pg. 4).

receiving general packages, and a deadline of April 25, 2010 for
receiving food packages at the Kearny facility.  (Id.).

On May 4, 2000, this Court received an addendum to the
Complaint filed by Barber.  (Docket entry no. 2).  The addendum
states that Johnson held another meeting with the NRU residents
concerning the transfer to EJSP on April 14, 2010.  At this
meeting, Johnson told the residents that it would facilitate the
transfer if the residents threw out their personal belongings
before moving.  Personal property was to be packed on a truck to
EJSP, and once there, the property would be subject to search by
trained dogs for contraband.  (Id.).

Defendant Merril Main told the residents that they would be
sitting "idle" at EJSP while the NJDOC and NJDHS Administrators
implement programs, therapy and visits, as well as supplying
meals and reconfiguring the administrative segregation unit for
more suitable housing for the civilly-committed residents.  The
name of the EJSP unit has been changed to Special Treatment Unit
("STU").  In addition, the NJDOC officers at EJSP were to be
trained for three weeks to deal with civilly-committed persons.
(Id.).

On April 28, 2010, defendant Johnson and Sgt. Sankowski told
the residents that any personal property that did not fit into
the containers provided for the move to EJSP could be sent home
or be thrown away.  That same date the residents were given the

4

new mailing address for their move to EJSP.  The mailing address, effective May 10, 2010, is Special Treatment Unit, P.O. Box 190, Avenel, New Jersey.  Consequently, all mail, food and other packages will be sent to Avenel while the residents are housed at EJSP.  (Id.).

Barber alleges that he asked Johnson why his mail and food packages were to be sent to Avenel rather than to EJSP in Rahway. Johnson told plaintiff that the Administrator of NJDHS, Merril Main had made this decision.  (Id.).

On June 9, 2010, this Court received a second addendum to plaintiff's Complaint.  Barber alleges that on May 17, 2010, he went to group therapy in the West Hose.  However, due to his current situation being placed in EJSP, he could not "fully mentally focus."  When Barber complained to Dr. Enright and Ms. Klos, they disagreed with plaintiff, so Barber left the group. (Addendum at pg. 1, Docket entry no. 4)

On May 17, 2010, at about 11:00 p.m., an officer came to get Barber to go to the East House and help him move three dryers onto the floor for use.  Barber alleges that the building is dirty, smells like dead animals, and it makes him sick to go over to the East House to work.  (Id. at pp. 1-2)

On May 18, 2010, Barber next complains that he was strip searched in the East House.  He was told to disrobe and had to bend over and spread his buttocks.  He also had to open his mouth

and spread his toes to be searched.  Barber states that his room
in the South House was searched while he was in the yard and not
present.  When Barber asked Administrator Johnson why he was
being singled out for a strip search and room search, Johnson
replied that he did not know.  (Id., at pg. 2).

Barber states that the transfer to EJSP occurred on May 11,
2010 and/or May 12, 2010.  He did not receive his mattress until
after 10:30 p.m.  He complains that the cell where he was placed
is cold and dirty, with dead roaches on the floor.  Dust and dirt
come out of the vents.  On May 13, 2010, he was told to go to the
mess hall in the Annex, which was a path of loose gravel and dirt
that smelled of goose droppings.  Once the residents received
their meals, they were told to take their food back to their
unit.  (Id., at pg. 3).

On May 27, 2010, Barber was awakened by the 1st shift
officer and told to report to the North House.  Upon arrival at
the North House, he was finger scanned ("Ion search").  (Id.).

Also on May 27, 2010, Barber and other SVP residents at EJSP
spoke to an attorney in the NJDHS' Advocacy Office.  The
residents were informed that Dr. Main had conducted a "Hair Score
Psychopathy Test", which allegedly labeled plaintiff as a
troublemaker with a lot of influence on the general population.
Barber states that he has not had any trouble or incidents in the
last year.  Being labeled as a troublemaker has caused conflict
with his attendance at group sessions.  Barber brought this

matter to the attention of Dr. Izer, a treatment member, complaining that he is being treated like a "problem" prisoner when he is not a problem or a prisoner.  Dr. Izer allegedly told plaintiff that "they" are working on it.  (Id., at pg. 4).

Barber complains that, as a civilly committed person, he should not be housed in a prison facility.  He further complains that he will be housed in the administrative segregation unit, which is a 23-hour lock-down unit.  Barber asserts that this transfer is a violation of his constitutional rights.  He further complains that the deprivation of personal property and the interference with his mail violate his constitutional rights. (Compl., ¶ 6).

Barber asks that he be provided with "the proper treatment of a federally funded facility."  He also seeks an unspecified amount in compensatory damages for the mental anguish and stress that he is suffering in being transferred to a prison facility. (Compl., ¶ 7).

II.  <u>STANDARDS FOR A SUA SPONTE DISMISSAL</u>

A district court is required to review a complaint in a civil action where the litigant is proceeding <u>in forma pauperis</u>. Specifically, the court is required to identify cognizable claims and to <u>sua sponte</u> dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because

Barber is proceeding in forma pauperis in this matter, this action is subject to sua sponte screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions."  Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v.

Gibson, 355 U.S. 41, 45-46 (1957)). See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009). The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights. Id. The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).[3] Citing its recent opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

---

[3] Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required." Fed.R.Civ.P. 8(d).

>First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."  <u>Fed. Rule Civ. Proc.</u> 8(a)(2).

<u>Iqbal</u>, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

>a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Iqbal</u>, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id</u>. at 1948.  The Supreme Court's ruling in <u>Iqbal</u> emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  <u>Id</u>. at 1949-50; <u>see</u>

10

also <u>Twombly</u>, 505 U.S. at 555, & n.3; <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that <u>Iqbal</u> provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957),[4] that applied to federal complaints before <u>Twombly</u>. <u>Fowler</u>, 578 F.3d at 210. The Third Circuit now requires that a district court must conduct the two-part analysis set forth in <u>Iqbal</u> when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [<u>Iqbal</u>, 129 S.Ct. at 1949-50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [<u>Id</u>.] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. <u>See Phillips</u>, 515 F.3d at 234-35. As the Supreme Court instructed in <u>Iqbal</u>, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" <u>Iqbal</u>, [129 S.Ct. at 1949-50]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id</u>.

<u>Fowler</u>, 578 F.3d at 210-211.

---

[4] In <u>Conley</u>, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. <u>Id</u>., 355 U.S. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal. See Erickson v. Pardus, 551 U.S. 89 (2007). Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

### III.   SECTION 1983 ACTIONS

Barber brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

IV.   <u>THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT</u>

The New Jersey SVPA, <u>N.J.S.A.</u> 30:4-27.24 *et seq.*, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). <u>N.J.S.A.</u> 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, <u>N.J.S.A.</u> 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  <u>N.J.S.A.</u> 30:4-27.34(b). The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." <u>N.J.S.A.</u> 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs.  <u>N.J.S.A.</u> 30:4-27.25.  The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed.  <u>Id</u>.  The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings.  N.J.S.A. 30:4-27.35.  A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge.  N.J.S.A. 30:4-27.36.

V.  ANALYSIS

A.  Transfer to Prison Facility Claim

The principal claim asserted in Barber's Complaint is that his transfer to a prison facility, as a civilly committed person under the SVPA, is unconstitutional.  Barber seeks to prevent his transfer accordingly.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court of the United States examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community. Id., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.  However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.  Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.  Id., 521 U.S. at 363, 364, 365-368.  Thus, the Supreme Court held that involuntary confinement under Kansas'

14

SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed. Id., 521 U.S. at 368-69. See also Seling v. Young, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in Hendricks and Seling, respectively.[5]  See Bagarozy v. Goodwin, Civil Action No. 08-468 (SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002). Therefore, this Court finds that Barber's transfer, with the SVP residents of the Kearny facility, to a segregated unit in the East Jersey State Prison does not, in and of itself, violate the U.S. Constitution's Due Process Clause.  Moreover, because the transfer has now been effected, plaintiff's claim for injunctive relief to prevent the transfer to EJSP is now rendered moot. Accordingly, the claim that plaintiff's transfer to a segregated unit within a prison facility is unconstitutional will be

---

[5]  Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released. United States v. Comstock, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of civil confinement as being unconstitutional.

dismissed for failure to state a cognizable claim of a
constitutional deprivation.

B.   Conditions of Confinement Claim

     Although plaintiff's transfer to a segregated unit within a
prison facility is not, in and of itself, a constitutional
violation, Barber makes additional allegations concerning the
conditions of confinement at the EJSP facility.   For instance, he
complains that he will be housed in a 23-hour lock-down facility.
However, Barber also states that Mr. Main had told the residents
that there would be a period of time needed to resolve issues of
recreation and yard time, meal supply and dining, and the
renovation of the space to make suitable living quarters for the
civilly committed residents.   See Youngberg v. Romeo, 457 U.S.
307, 321-22 (1982)("Persons who have been involuntarily committed
are entitled to more considerate treatment and conditions of
confinement than criminals whose conditions of confinement are
designed to punish.").   Moreover, Barber alleges that his cell is
dirty, has roaches on the floor, and he has to walk through a
gravel and dirt path that smells like goose droppings to get to
the mess hall.

     Generally, the Fourteenth Amendment requires that civilly
committed persons not be subjected to conditions that amount to
punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[6] within

_____

     [6]  In Bell v. Wolfish, the Supreme Court held that whether a
condition of confinement of pretrial detainees violated their
constitutional rights turns on whether the disability is imposed

16

the bounds of professional discretion, Youngberg, 457 U.S. at 321-22.  Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307.  The Constitution is not concerned with de minimis restrictions on patients' liberties.  Id. at 320.  Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed."  Seling, 531 U.S. at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs.  See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Barber's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a 23-hour lock down facility.  This restriction also involves limited recreation yard time and having to dine at the Annex (Rahway Camp), which limits time for eating and washing up afterwards.  However, Barber acknowledges in his Complaint that

for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

17

these conditions are merely temporary until the "Ad Seg Unit" is renovated for the SVP residents.  At most, the administrators told plaintiff and the other SVP residents that it would take a month or two to complete renovations to accommodate the less restrictive and treatment-oriented environment suitable for civilly committed SVPs.  This Court further observes from plaintiff's addendum (Docket entry no. 4) that Barber works in the East House, walks to the dining hall at the Annex, and goes to group sessions, which tends to belie the allegation that the residents are subject to a 23-hour lockdown.

Moreover, even if plaintiff has temporary restrictions in yard activity, mobility, and dining facilities, the Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme.  See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[7] to segregated confinement of civilly committed SVPs).  See also Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise extending Sandin to civil commitment settings). As stated above, Barber's complaints about the restrictions on his confinement are minimal and clearly temporary.  Consequently,

---

[7]  In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

this Court finds that Barber has failed to state a cognizable claim in this regard at this time.

Barber also alleges unsanitary or unhealthy conditions of confinement, namely, that there is poor air circulation (dust and dirt in the vents) and dead roaches on the floor when he arrived at EJSP.  Certainly, these conditions bear no reasonable relation to the purpose for which Barber and the other SVP residents are committed, and to the extent these uninhabitable living conditions are not addressed with the renovations, Barber may have a viable Fourteenth Amendment conditions of confinement claim.

Nevertheless, this Court is guided by the Third Circuit's determination in the context of a Fourteenth Amendment claim, as set forth in Hubbard v. Taylor, 538 F.3d 229 (3d Cir. 2008)("Hubbard II").  In Hubbard II, the Third Circuit held that requiring pretrial detainees (claims by pretrial detainees, like civilly committed persons, are governed by the Fourteenth Amendment) to sleep on a mattress on the floor in a cell holding three inmates for three to seven months did not constitute punishment in violation of the Fourteenth Amendment.  538 F.3d at 234-35.  The court rejected the Second Circuit's per se ban on the practice in Lareau v. Manson, 651 F.2d 96 (2d Cir. 1981), and instead considered it "as part of the 'totality of the circumstances within [the] institution.'"  Hubbard II, 538 F.3d at 235 (quoting Hubbard v. Taylor, 399 F.3d 150, 160 (3d Cir.

19

2005)("Hubbard I")[8]).  The court then concluded that although the
plaintiffs "did spend a substantial amount of time on floor
mattresses," they had access to large day rooms and the record
did not substantiate plaintiffs' claims that the use of floor
mattresses caused disease or led to the splashing of human waste
on the plaintiffs. Id.  After noting the efforts made by the jail
to improve conditions, the court found "that Plaintiffs were not
subjected to genuine privations and hardship over an extended
period of time for purposes of their due process claim."  Id.

Based on the allegations in Barber's complaint, many of
which were speculative (plaintiff had not yet been transferred to
EJSP when he made some of these allegations concerning the poor
conditions of confinement) at the time he filed his Complaint,
this Court finds that plaintiff's allegations concerning the
"totality of circumstances" surrounding his confinement are not
sufficient at this time to suggest that he has been "subjected to
genuine privations and hardship over an extended period of time
for purposes of [his] due process claim." See Hubbard II, 538
F.3d at 235.  Therefore, the Court will dismiss the conditions of
confinement claim, without prejudice, for failure to state a
claim at this time.  To the extent that these conditions continue

_____

[8]    Hubbard I is the predecessor to Hubbard II.  In Hubbard
I, the Third Circuit remanded plaintiffs' case to the district
court to apply the correct standard for a conditions of
confinement claim by a detainee under the Fourteenth Amendment.
399 F.3d at 166-67.  The district court subsequently ruled in
defendants' favor and plaintiffs appealed, resulting in Hubbard
II.   538 F.3d at 230.

for a longer period of time than suggested by the NJDHS and NJDOC
administrators, Barber may seek leave to re-open this case and
file an amended pleading.[9]

C.   Interference with the Mail Claim

Barber next appears to assert that the delivery of his mail
to the Annex, rather than directly to him at EJSP, violates his
First Amendment rights.

Inmates have a limited liberty interest in their mail under
the First and Fourteenth Amendments.  Jones v. Brown, 461 F.3d
353, 358 (3d Cir. 2006), cert. denied, 549 U.S. 1286 (2007).[10]

---

[9]  Should plaintiff so choose to amend his Complaint to cure
the deficiencies noted herein, pursuant to Federal Rule of Civil
Procedure 15, Barber should note that when an amended complaint
is filed, the original complaint no longer performs any function
in the case and "cannot be utilized to cure defects in the
amended [complaint], unless the relevant portion is specifically
incorporated in the new [complaint]."  6 Wright, Miller & Kane,
Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes
omitted).  An amended complaint may adopt some or all of the
allegations in the original complaint, but the identification of
the particular allegations to be adopted must be clear and
explicit.  Id.  To avoid confusion, the safer course is to file
an amended complaint that is complete in itself.  Id.

[10]  In Jones v. Brown, the United States Court of Appeals
for the Third Circuit held that the legal mail policy of state
prison in opening legal mail outside the presence of the inmate
violated the inmate's First Amendment right to freedom of speech,
and was not reasonably related to prison's legitimate penological
interest in protecting health and safety of prisoners and staff.
461 F.3d at 358.  The Third Circuit also has held that "a pattern
and practice of opening properly marked incoming court mail
outside an inmate's presence infringes communication protected by
the right to free speech.  Such a practice chills protected
expression and may inhibit the inmate's ability to speak,
protest, and complain openly, directly, and without reservation
with the court."  Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir.
1995) (applying the Turner analysis), implied overruling on other
grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d

21

However, an inmate's constitutional right to send and receive mail may be restricted for legitimate penological interests. See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987). In Turner, the Supreme Court of the United States found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest. Id. at 89. The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. Turner, 482 U.S. at 89-91. The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security. Id.

_____

Cir. 1997). Thus, the assertion that legal mail is intentionally opened and read, delayed for an inordinate period of time, or stolen may state a First Amendment claim. See, e.g., Antonelli v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v. Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

The United States Court of Appeals for the Third Circuit has applied Turner in analyzing constitutional claims by civilly committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied Turner when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[11]  See Willis v. Smith, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying Turner to SVP claims concerning mail handling procedures); Ivey v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30, 2008)(applying Turner, but noting that a civil confinement is significantly different from a criminal confinement); Francis v. Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied Turner in cases involving civilly confined persons); Marsh v. Liberty Behavioral Health Care, Inc., 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed. Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

---

[11]  Essentially, the First Amendment analysis under Turner mirrors the due process analysis under Youngberg; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  See Beaulieu v. Ludeman, 2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent with Youngberg because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

In <u>Rivera</u>, the Third Circuit affirmed the district court's ruling that a facility housing civilly committed SVPs has a legitimate interest in both the safety of its facility and the rehabilitation of its patients. <u>Rivera</u>, 224 Fed. Appx. at 151 (citing <u>Waterman v. Farmer</u>, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")).  Specifically, the court upheld as constitutional the STU's policy that allows staff to open packages not marked as "legal mail" to assure that the packages do not contain contraband (<u>i.e.</u>, items either harmful to staff and residents, or detrimental to rehabilitation).  The court found that plaintiff was free to send and receive mail so long as the content of his mail was not sexually explicit.  Moreover, the Third Circuit found no error in the district court's conclusion that there were no ready alternatives to mail security and that the STU's policy appeared to be the only viable alternative, thus supporting the reasonableness of the mail policy. <u>Rivera</u>, 224 Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute that the staff at EJSP, where plaintiff and other SVP residents are newly housed, has a legitimate interest in both the safety of its facility and rehabilitating its patients.  As noted above, these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern.  The staff

24

clearly must determine if any items coming through the mail pose
a threat to the safety of the staff or the other residents.  They
also must decide if any of the materials passing through the mail
could be detrimental to a resident's therapy.  Consequently, as
set forth by the Supreme Court and the Third Circuit, the Court
must defer to the prison officials when it comes to issues of
managing a safe and operational prison facility.  In this case,
delivery of letters and packages at the Avenel facility located
close by, where the staff is trained with respect to SVP issues
unlike the general NJDOC staff at EJSP, assures that harmful
materials are not being passed through the mail, but also allows
for specialized treatment regarding SVP residents.  This new
policy, which appears to be preliminarily instituted because of
the recent transfer of the SVP residents to EJSP, clearly bears a
rational relationship to both interests discussed above.
Moreover, in his interference with the mail claim, Barber does
not allege a single incident where his mail has not been
delivered or received.[12]  Rather, his only complaint seems to be
that his mail is being sent to another facility instead of EJSP
where he now resides.  Barber does not articulate a claim that
prison officials are intentionally delaying his mail.  He clearly
admits that he is free to use and receive mail and packages in

---

[12]  A single interference with the delivery of an inmate's
personal mail, without more, does not rise to the level of a
constitutional deprivation.  Morgan v. Montayne, 516 F.2d 1367
(2d Cir. 1975), cert. denied, 424 U.S. 973 (1976).

general.  Therefore, the Court will dismiss this claim without
prejudice at this time, and allow Barber to file an amended
pleading, consistent with the pleading requirements of Rule
8(a)(2) and amended pleading requirements of Rule 15 of the
Federal Rules of Civil Procedure, as discussed in fn. 10 of this
Opinion, supra, if Barber in fact wishes to pursue such a claim.

D.   Deprivation of Property Claim

     Barber also appears to be asserting a claim that he has been
deprived of his personal property in violation of his
constitutional rights.

     The Fourteenth Amendment provides, in pertinent part here,
that the State may not "deprive any person of life, liberty, or
property, without due process of law[.]"  The "due process of
law" essentially requires that the government provide a person
notice and opportunity to be heard in connection with the
deprivation of life, liberty or property.  Zappan v. Pennsylvania
Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir.
2005)("The essential requirements of any procedural due process
claim are notice and the opportunity to be heard.").  Hence, to
establish a prima facie case of a procedural due process
violation, a plaintiff must establish: (1) a deprivation of a
constitutionally protected liberty or property interest, (2)
state action, and (3) constitutionally inadequate process.  See
Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002)
("Procedural due process claims, to be valid, must allege state

26

sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Barber must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, Barber fails to specify what property the NJDOC and NJDHS officials did not permit him to keep.  Moreover, he admits that the residents were given a box to pack their belongings, and were told that anything that did not fit could be sent home or thrown away.  Consequently, there is no real loss of property demonstrated.

Indeed, the limitations placed by NJDOC and NJDHS officials on personal belongings to be moved with the transfer of the

27

residents from the Kearny facility to EJSP were neither arbitrary
or capricious, but plainly were implemented in order to address
the logistics of the move and to further a legitimate goal of
maintaining a safe and organized mass transfer of SVPs from one
facility to another.  In this regard, Barber simply has not
demonstrated a constitutionally-recognized property interest in
the continued possession of unrestricted personal property
necessary to satisfy the threshold requirement of a deprivation
of property interest.  See Semler v. Ludeman, 2010 WL 145275, *25
(D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Barber was deprived of
personal property as a result of the transfer to EJSP, he has a
post-deprivation remedy.  Property loss caused by the intentional
acts of government officials does not give rise to a procedural
due process claim under § 1983 where a post-deprivation remedy
satisfying minimum procedural due process requirements is
available under state law.  See Parratt v. Taylor, 451 U.S. 527
(1981) (overruled in part on other grounds by Daniels v.
Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494
U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984);
Holman, 712 F.2d at 856.[13]  The New Jersey Tort Claims Act

---

[13]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982),
the Supreme Court explained, however, that post-deprivation
remedies do not satisfy the Due Process Clause if the deprivation
of property is accomplished pursuant to established state
procedure rather than through random, unauthorized action.  455
U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional
Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United

("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government.  See Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Barber here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

E.  Unlawful Search Claim

Barber alleges that he was subjected to a pat-search and finger scan (Ion search) as he was coming in from the yard on May 27, 2010.  He further alleges that he was subjected to a strip search on May 18, 2010, when he was walking to the East House.  A cell search also was conducted outside of his presence on May 18, 2010.  It would appear that plaintiff is asserting that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding

---

States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529. The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530. The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted). The same conclusion was reached with respect to pretrial detainees other than convicted prisoners. See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity

searches of pretrial detainees do not violate the Fourth Amendment).[14]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally. See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786

_____

[14]  In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Barber's primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test employed by Wolfish, this Court finds that the manner and place in which Barber was pat-searched and finger-scanned were plainly reasonable and did not violate Barber's Fourth Amendment rights. First, the pat search and finger scan were conducted when Barber was returning from the prison yard and before he could return to his living quarters. See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included

32

removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints). See also Serna, 567 F.3d at 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones.

Moreover, there are no allegations that the guards conducted the pat search and finger scan in a menacing or degrading manner. Barber does not allege that there was physical force used or that the search was observed by any other SVP patients or by staff members of the opposite sex. Barber also does not allege that the search was done in a menacing manner. See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).

Of course, Barber also alleges that he was subjected to a strip search on May 18, 2010. The search was conducted while he traveling to or from the East House, suggesting that plaintiff's search was conducted for the purpose of prison security and the effective management of EJSP with respect to reducing integration between prisoners and SVP residents. Moreover, Barber's allegations concerning the strip search do not indicate a highly

intrusive and degrading search.  There is no allegation that the
search was done in a menacing or harassing manner, in front of
female officers, or for a purpose other than prison security and
management.  The strip search and cell search were consistent
with plaintiff's travels to another part of the EJSP outside of
the SVP living quarters.  The searches were not repetitive or
abusive.  Accordingly, based on all of these factors, this Court
will dismiss Barber's Fourth Amendment unlawful search claim at
this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure
to state a cognizable claim under § 1983.  However, this
dismissal is without prejudice to Barber seeking to re-open his
case with an amended Complaint alleging additional facts to
support an unlawful strip search claim.

F.   Interruption of Treatment Claim

     Finally, Barber appears to assert that therapy/treatment
sessions have been denied because of the transfer to EJSP.  He
contends that he has been denied the right to adequate treatment
and reasonable care applicable to civilly committed SVPs, in
violation of the Fourteenth Amendment.

     The Fourteenth Amendment to the United States Constitution,
§ 1, guarantees that "[n]o State shall ... deprive any person of
life, liberty, or property, without due process of law."  This
due process guarantee has been interpreted to have both
procedural and substantive components, the latter which protects
fundamental rights that are so "implicit in the concept of

34

ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." Palko v. Conn., 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry. Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right. See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). However, regulations not implicating fundamental rights (in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review, and will generally succeed only if the government action shocks the conscience. See Glucksberg, 521 U.S. at 728.

With respect to Barber's claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender. The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment. Specifically, the Supreme Court held that there is a constitutional right of mentally disabled

persons confined at a state institution to "minimally adequate habilitation", self-care treatment or training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints. <u>Youngberg</u>, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated. <u>Youngberg</u>, 457 U.S. at 320. Although restrictions burdening a fundamental right generally receive strict scrutiny, in <u>Youngberg</u>, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions. <u>Id</u>. at 322. Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." <u>Id</u>. at 321 (internal quotation and citation omitted). Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." <u>Id</u>. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses.  288 F.3d at 545.  Leamer was not a civilly committed sex offender like plaintiff here.  Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute.  The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an "inherent and integral element" of the statutory scheme.  Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of

Barber's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly recognize New Jersey's obligation to provide treatment to SVPs for their eventual release based on successful therapy.  <u>See</u> <u>N.J.S.A</u>. 30:4-27.32(a)("If the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing the involuntary commitment of the person to a facility designated for the custody, care and **treatment** of sexually violent predators")(emphasis added); <u>N.J.S.A</u>. 30:4-34(b)("The Division of Mental Health Services in the Department of Human Services shall provide or arrange for treatment for a person committed pursuant to this act.  Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators."); <u>N.J.S.A.</u> 30:4-27.36(a)(At any time during the involuntary commitment of a person under this act, if the person's treatment team determines that the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released, the treatment team shall recommend that the Department of Human Services authorize the person to petition the court for discharge from involuntary commitment status"); <u>see also</u> <u>Kansas v. Hendricks</u>, 521 U.S. 346, 367 (1997)(concluding from similarly-worded provisions of Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous]

designed to effect recovery ....")(alterations in
original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court
concludes that Barber's liberty interest in treatment is
fundamental and cognizable for purposes of both procedural and
substantive due process analyses.  But see Bailey v. Gardebring,
940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952
(1992)(where the Eighth Circuit noted that Youngberg did not
establish a right for the civilly committed to treatment per se;
the Supreme Court only "held that the Constitution required only
such 'minimally adequate training ... as may be reasonable in
light of [the] liberty interest[ ] in safety and freedom from
unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322).
In Bailey, the Eighth Circuit concluded that plaintiff had no
right to "psychiatric treatment to overcome a 'sexual offender
condition'" because he "was neither in danger during his civil
commitment nor was he subject to any restraints beyond the
ordinary incidents of any involuntary confinement."  Id. at 1153,
1154.  Citing Bailey, district courts in the Eighth Circuit have
since concluded that civilly committed sexual predators have no
substantive due process right to mental health treatment,
adequate or otherwise.  See Semler v. Ludeman, 2010 WL 145275, at
*26 (D. Minn. Jan. 8, 2010)("Because this Court has not
recognized a constitutional right to effective 'treatment' in the
context of civilly committed sex offenders, Plaintiffs [alleging
substantive due process violations through ineffective treatment]

have failed to allege a due process claim ....")(citing
Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11,
2008)(finding, in ultimately concluding that involuntarily
committed sex offender's right to treatment is not "clearly
established" for purposes of 28 U.S.C. § 2254(d)(1), that
Youngberg "only recognized a right to 'minimally adequate'
treatment that reduces the need for restraints," and not a
"comparable right to treatment that facilitates release")).

     Nevertheless, while this Court may recognize that Barber has
a fundamental and cognizable liberty interest in treatment, based
on the allegations and admissions by plaintiff in his Complaint
and addendums, this Court also determines that there has been no
procedural or substantive due process violations at this time.

     With respect to Barber's right to procedural due process,
there does not appear to be any basis to plaintiff's claim that
there has been a categorical denial of therapy due to his
transfer to EJSP's administrative segregation unit.  In Leamer,
the Third Circuit, relying on Sandin, found that Leamer would
face "significant obstacles" in establishing a procedural due
process claim based on his placement on RAP (restricted
activities program) status because the mere fact of placement in
administrative segregation is not in and of itself enough to
implicate a liberty interest.  Leamer, 288 F.3d at 546.  In the
instant case, Barber is not actually confined in administrative
segregation for the purpose of punishment, but rather, he and the
other SVP residents at the Kearny facility were transferred to a

unit at EJSP separate and apart from the convicted prisoners. Moreover, as explained below, Barber admits that he has received therapy since his arrival at EJSP.

This Court likewise finds no substantive due process violation at this time. Substantive due process prevents the government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty." Glucksberg, 521 U.S. at 721. Under this standard, Defendants' actions in denying Barber his statutory right to treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the conscience. See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release")

Here, despite Barber's initial allegation, defendants have not categorically declined to provide any mental health treatment to the SVP residents at EJSP, but only projected a short period for disruption of treatment so as to accomplish the transfer and/or renovation of the segregated nit at EJSP. Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Barber's substantive due process rights. Indeed, plaintiff admits that therapy sessions

were resumed only days after he was moved to EJSP, but that he cannot "focus" because of the prison environment.

Thus, based on Barber's admission that treatment has been offered, the Court concludes that the treatment has been made available at EJSP and there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged. Any deviation in providing treatment was merely temporary to accomplish the transfer and renovate the SVP quarters at EJSP. Therefore, this Court concludes that the short-lived disruption of therapy and treatment was not so egregious as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, Barber's claim alleging inadequate treatment will be dismissed without prejudice for failure to state a cognizable claim of a deprivation of a constitutional right at this time.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff may seek leave to re-open this case to file an amended pleading to cure the deficiencies noted herein.  An appropriate order follows.


_____
STANLEY R. CHESLER
United States District Judge

43